Kelvin MOYE, Plaintiff,

v.

**Donald SELSKY and Roland Cote, Defendants.**

No. 90 Civ. 2503(RJW).

United States District Court, S.D. New York.

July 2, 1993.

Scott L. Lessing, New York City, for plaintiff.

Robert Abrams, Atty. Gen. of the State of NY, Barbara B. Butler, Asst. Atty. Gen., New York City, for defendants.

ROBERT J. WARD, District Judge.

Plaintiff Kelvin Moye has moved, pursuant to Rule 56, Fed.R.Civ.P., for partial summary judgment in this action.[1] Defendants Donald Selsky and Roland Cote ("defendants") have cross-moved, pursuant to Rule 56, Fed.R.Civ. P., for summary judgment. For the reasons that follow, plaintiff's motion is granted and defendants' motion is granted in part and denied in part.

---

1. On August 1, 1990, plaintiff, appearing *pro se,* filed a Rule 56 motion for summary judgment in this action. Plaintiff subsequently secured counsel and, on March 29, 1993, filed the instant motion for (i) leave to amend the complaint, pursuant to Rule 15, Fed.R.Civ.P., and (ii) partial summary judgment. At the request of plaintiff's counsel, this Court endorsed the August 1, 1990 motion as withdrawn without prejudice on June 2, 1993. In addition, on April 20, 1993, the Court granted on consent that portion of the instant motion which sought leave to amend the complaint. Accordingly, the only portion of plaintiff's two dispositive motions that is currently pending before this Court is the instant motion for partial summary judgment.

## BACKGROUND

At all times relevant to this action, plaintiff was incarcerated in the Sing Sing Correctional Facility ("Sing Sing"), which is operated by the New York State Department of Correctional Services ("DOCS"). On February 23, 1988, an inmate named W. Francisco was stabbed in that facility. The next day, Moye was placed in a punitive segregation cell of the Sing Sing Special Housing Unit ("SHU") to await a superintendent's hearing ("the hearing") which would determine whether he was involved in the stabbing.

Cote, who is a DOCS hearing officer, conducted the hearing on March 1, March 7 and March 8, 1988. At the conclusion of the hearing, Cote found plaintiff guilty of assaulting Francisco and sentenced plaintiff to a year of confinement in the SHU.

Selsky is the Director of Special Housing and Inmate Discipline for DOCS. In that capacity, he is the person designated by the Commissioner of DOCS to review inmate appeals of decisions rendered by hearing officers such as Cote. Selsky reviewed and affirmed ("the review") Cote's decision.

On December 20, 1988, Justice Gerard E. Delaney of the New York State Supreme Court granted plaintiff's petition pursuant to Article 78 of the New York Civil Practice Law and Rules and annulled and vacated defendants' determination. Plaintiff was not released from the SHU until January 12, 1989, twenty-three days after Justice Delaney's decision.

In total, Moye was held in the SHU for 323 consecutive days in connection with the Francisco stabbing. Defendants do not dispute that, while plaintiff was in the SHU, he was "confined to a solitary cell twenty-three hours a day, seven days a week, without communication by telephone, without access to the commissary, and without packages from outside Sing Sing." Amended Complaint at ¶ 3.

In his amended complaint, Moye contends that the hearing before Cote and the review by Selsky violated his rights pursuant to 42 U.S.C. § 1983 and the due process clause of the Fourteenth Amendment:

*Events Preceding the Hearing*

On February 26, two days after he was placed in the SHU for his alleged role in the stabbing of Francisco, Moye was served with an "Inmate Misbehavior Report" which indicated that, "[b]ased on confidential information received in a continueing [sic] investigation from two reliable sources, you have been positively identified as the person who stabbed inmate W. Francisco .... on 2/23/88 on T gallery in [Housing Block "B"] at approx. 10:55 A.M." Lessing Aff.Ex. 1.

On the same day, Moye met with a DOCS employee who was assigned to assist him in preparing for the hearing. He told this individual that he wished to call as witnesses three inmates and a correction officer. Moye expected that these witnesses would provide an alibi by placing him in other locations within the prison at the time of the stabbing. Among these witnesses was an inmate named Dunbar, who was the gallery clerk for galleries "U" and "Z", which comprised a tier of cells in Sing Sing. Plaintiff was housed on gallery "Z" on the day of Francisco's stabbing. Moye expected Dunbar to make a statement[2] indicating that they had had a five to ten minute conversation at Dunbar's cell on the "U" gallery at about the time Francisco was stabbed on the "T" gallery. Moye believed that this would provide him with an alibi which would establish his innocence.

*The Hearing and Appeal*

On March 1, 1988, the first day of the hearing, Cote informed Moye that Dunbar had been transferred to another DOCS facility. Plaintiff refused to waive Dunbar as a witness, asserting that Dunbar's statement would help prove his innocence. Cote told Moye that he would explore the possibility of having Dunbar make a statement by telephone, a practice which was permitted under DOCS procedure.

---

2. According to defendants, witnesses at disciplinary hearings make statements; they do not give sworn testimony. Letter from Barbara B. But- ler, Asst. Att'y Gen., to Judge Robert J. Ward (May 6, 1993) at 2 n. 1.

Other witnesses made statements to Cote on March 7 and 8.[3] One of these witnesses, Correction Officer Hicks, who was on duty on gallery "Z" at the time of the assault, was asked whether he saw plaintiff speaking with Dunbar on gallery "U" immediately prior to plaintiff's return to his cell for "lock-in." Hicks stated that lock-in occurred on February 23 between 10:45 and 11:00 a.m. However, he was unable to recall whether he had seen Moye speaking with Dunbar immediately prior to lock-in.

Moye called inmate Fred Scott, who was housed in the cell next to the one where Moye was housed at the time of the stabbing. Scott indicated that he saw Moye in the prison barber shop up until 10:30 a.m. on the morning of February 23 and that he then saw Moye return to his cell no later than 10:45 a.m.

Given Hicks's inability to recall whether he had seen Moye and Dunbar speaking immediately prior to lock-in, plaintiff asserted that Dunbar was the only person who could place him at a location other than the scene of the stabbing between 10:30 and 10:45. Nevertheless, Cote did not permit Dunbar to make a statement. Moreover, Cote did not provide Moye with a written statement explaining why Dunbar was not permitted to make a statement.

The only evidence presented at the hearing linking Moye to the stabbing consisted of statements by two correction officers, who indicated that confidential informants had implicated plaintiff in the assault. Moye was not present when the correction officers made their statements and Cote never interviewed any of the informants.

At the conclusion of the hearing, Cote informed Moye that the assault on Francisco did not occur at 10:55 a.m., as was stated on the Inmate Misbehavior Report. Instead, according to the prison logbook, the victim was found at 10:55 a.m. and the assault occurred an indeterminate amount of time before then.

Cote found Moye guilty of assaulting Francisco and sentenced him to a year of punitive segregation in the SHU. Moye filed an administrative appeal with Selsky, asserting that Cote had denied him the right to call Dunbar and citing *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). On May 12, 1988, Selsky affirmed the hearing disposition.

As indicated above, defendants' determination was subsequently annulled and vacated by a Justice of the New York State Supreme Court in an Article 78 proceeding. That court found Cote's determination to prohibit Dunbar from making a statement, which was affirmed by Selsky, to be a violation of Moye's due process rights and DOCS's rules and regulations.

*The Instant Motions*

Plaintiff now moves for partial summary judgment with respect to Claims One and Three of the Amended Complaint,[4] but not with respect to Claim Two.[5] Plaintiff does

---

3. Francisco did not appear at the hearing because he did not see his assailant.

4. In Claim One of the Amended Complaint, plaintiff alleges, in relevant part:
 Cote, by refusing to permit ... Dunbar to present crucial testimony that posed no hazard to institutional safety or correctional goals, improperly and unjustifiably subjected Mr. Moye to 323 days of SHU incarceration, ... [thereby depriving] Mr. Moye of his liberty interest and his right to due process of law under the Fourteenth Amendment ... and 42 U.S.C. § 1983. Amended Complaint ¶¶ 39–40.
 In Claim Three of the Amended Complaint, plaintiff alleges, in relevant part:
 Selsky, by failing to remedy defendant Cote's unconstitutional refusal to permit ... Dunbar to testify, after learning of defendant Cote's refusal through Mr. Moye's appeal, improperly and unjustifiably subjected Mr. Moye to 323 days of SHU incarceration, ... [thereby depriving] Mr. Moye of his liberty interest and his right to due process of law under the Fourteenth Amendment ... and 42 U.S.C. § 1983. *Id.* ¶¶ 45–46.

5. In Claim Two of the Amended Complaint, plaintiff alleges, in relevant part:

 Cote, by failing to assess independently the reliability and credibility of the confidential informants who provided the only evidence against Mr. Moye, improperly and unjustifiably subjected Mr. Moye to 323 days of SHU incarceration, ... [thereby depriving] Mr. Moye of his liberty interest and his right to due process of law under the Fourteenth Amendment ... and 42 U.S.C. § 1983. Amended Complaint ¶¶ 42–43.

not move for summary judgment on the issue of damages with respect to these claims. Defendants cross-move for summary judgment on all three of plaintiff's claims.

## DISCUSSION

### A. *Standards for Granting Summary Judgment Pursuant to Rule 56*

Summary judgment may be granted when the moving party establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Rosen v. Thornburgh*, 928 F.2d 528, 532 (2d Cir.1991). If no rational fact-finder could find in the nonmovant's favor, there is no genuine issue of material fact and summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). In making this determination, the court should not resolve disputed issues of fact, but rather, while resolving ambiguities and drawing reasonable inferences against the moving party, must assess whether material factual issues remain for the trier of fact. *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)).

### B. *Claim One: Defendant Cote's Exclusion of Moye's Witness*

■ In the context of a prison disciplinary proceeding, an inmate is entitled to call witnesses unless doing so would "be unduly hazardous to institutional safety," would delay swift punishment or would cause the proceeding to exceed "reasonable limits" due to "irrelevance [or] lack of necessity" of the statements such witnesses would provide. *Wolff v. McDonnell*, 418 U.S. 539, 566, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935 (1974); *see also Ponte v. Real*, 471 U.S. 491, 495, 105 S.Ct. 2192, 2195, 85 L.Ed.2d 553 (1985) ("the inmate's right to present witnesses is necessarily circumscribed by the penological need to provide swift discipline in individual cases"); *Scott v. Kelly*, 962 F.2d 145, 147 (2d Cir.1992). A court must employ a balancing test, weighing the inmate's liberty interest

"against the needs of the prison, and some amount of flexibility and accommodation is required." *Wolff v. McDonnell*, 418 U.S. at 566, 94 S.Ct. at 2979; *see also Freeman v. Rideout*, 808 F.2d 949, 954 (2d Cir.1986) ("On review, it is the responsibility of the court to balance the concern to safeguard the rights of individual inmates with the legitimate needs and aims of the penal institution"), *cert. denied*, 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988).

■ It is true, as defendants assert, that the outcome of a prison disciplinary hearing passes constitutional muster so long as there was "some evidence in the record," "a modicum of evidence" or "any evidence in the record" upon which the finder of fact relied. *Superintendent v. Hill*, 472 U.S. 445, 454–56, 105 S.Ct. 2768, 2773–75, 86 L.Ed.2d 356 (1985). But the evidentiary standard established by the *Hill* court concerns the *weight* of evidence necessary to impose further punishment on a prisoner, and does not apply to a procedural due process challenge, such as is presently before the Court, which alleges the unconstitutional *exclusion of witnesses* from an evidentiary hearing. *See Freeman v. Rideout*, 808 F.2d at 954–55 (first applying procedural due process test enunciated in *Wolff* and *Ponte* and then determining whether there is "some evidence" which supports decision of prison disciplinary board); *Moore v. Scully*, No. 90 Civ. 3817(MEL), 1993 WL 22129, at *3 (S.D.N.Y. Jan. 26, 1993).

■ The standard to be applied in a procedural due process challenge was articulated in *Ponte v. Real*, 471 U.S. 491, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). In that case, the Court was presented with the question of whether prison officials are required, under federal due process principles, to explain why witnesses were not allowed to testify at a prison disciplinary hearing. The Court held that prison officials may be required to proffer such an explanation, but they may do so either at the time of the hearing or in a later court proceeding in which the exclusion is challenged. The Court then stated, "so long as the reasons are *logically related* to preventing undue hazards to 'institutional safety

or correctional goals,' the explanation should meet the due process requirements as outlined in *Wolff."* *Id.* at 497, 105 S.Ct. at 2196 (emphasis added) (quoting *Wolff v. McDonnell,* 418 U.S. at 566, 94 S.Ct. at 2979), *quoted in Fox v. Coughlin,* 893 F.2d 475, 478 (2d Cir.1990). The *Ponte* court explicitly rejected the proposed standard put forth by the prison officials in that case, which would have, "place[d] the burden of proof on the inmate to show why the action of the prison officials in refusing to call witnesses was arbitrary or capricious." *Ponte v. Real,* 471 U.S. at 499, 105 S.Ct. at 2197. Rather, the burden is on the prison official to prove the rationality of the decision to exclude witnesses. *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30–31 (2d Cir.1991); *Fox v. Coughlin,* 893 F.2d at 478; *Joyner v. Coughlin,* No. 92 Civ. 7613(RPP), 1993 WL 97224, at *3 (S.D.N.Y. Mar. 26, 1993); *Moore v. Scully,* 1993 WL 22129, at *1.

There is no evidence in the record that Cote gave reasons at the hearing for excluding Dunbar. Furthermore, the papers submitted by defendants in connection with the instant motions do not demonstrate a rational basis for Cote's decision. Defendants do not contend that Dunbar's presence at the hearing would have compromised institutional safety. Nor do defendants assert that Dunbar's statement would have been irrelevant. Finally, defendants do not argue that Dunbar, who had been transferred to another facility, could not have given a statement over the telephone. Rather, the correctional goal relied upon by defendants is contained in the "lack of necessity" prong of the *Wolff* test. In particular, defendants assert that any statement by Dunbar would not have established Moye's innocence and would have been cumulative to Scott's statement.

■ The Court finds that defendants have not proven a logical relationship between Cote's decision to exclude Dunbar and a correctional goal.[6] In reaching its conclusion, this Court is mindful of the Supreme Court's admonition that federal tribunals "should not be too ready to exercise oversight and put aside the judgment of prison administrators." *Wolff v. McDonnell,* 418 U.S. at 566, 94 S.Ct. at 2979.

Defendants note that, "Dunbar's statement, if believed, would not have necessarily established plaintiff's innocence since plaintiff could have spoken to ... Dunbar and still have assaulted the inmate. Unfortunately, it does not take more than a moment or two to go down a flight of stairs, stab someone and go back up the flight of stairs." Letter from Barbara B. Butler, Asst. Att'y Gen., to Judge Robert J. Ward (May 6, 1993) at 2.

Nevertheless, if Dunbar had credibly confirmed Moye's version of events, he would have provided corroboration of Moye's whereabouts during the 10:30 to 10:45 period

---

6. Pursuant to N.Y.Comp.Codes R. & Regs. tit. 7, § 251–5.1(b),

> [t]he disciplinary hearing ... must be completed within 14 days following the writing of the misbehavior report unless otherwise authorized by the [DOCS] commissioner or his designee. Where a delay is authorized, the record of the hearing should reflect the reasons for any delay or adjournment, and an inmate should ordinarily be made aware of these reasons unless to do so would jeopardize institutional safety or correctional goals.

Defendants claim that, under this rule, the fourteen day period expired on March 8, 1988, while plaintiff contends that Cote had until March 9, 1988 to complete the hearing.

Regardless of which date is correct, Cote was notified on March 1, 1988, the first day of the hearing, of Moye's request for a statement by Dunbar. Cote therefore had seven or eight days to arrange for Dunbar to make a statement within the period allotted for completion of the hearing.

Furthermore, the DOCS Commissioner can authorize an extension of time within which to complete a disciplinary hearing. *Id.* Such extensions have previously been authorized in order to accommodate delays resulting from an inmate's request to call witnesses. *See Aviles v. Scully,* 154 A.D.2d 371, 372, 545 N.Y.S.2d 847, 848–49 (1989). Had Cote requested such an extension, in order to obtain a statement from Dunbar, it is highly unlikely that Moye would have objected. Inasmuch as the fourteen day rule was presumably promulgated for the inmate's protection, so that he would not have to remain in the SHU for an unreasonable amount of time pending adjudication of his case, *see Vasquez v. Coughlin,* 726 F.Supp. 466, 469–70 n. 5 (S.D.N.Y.1989), a waiver of this rule by an inmate would not violate any correctional goal other than the inmate's interest in a timely completion of the hearing.

of time not accounted for by Scott's statement. Dunbar's statement would not have been cumulative and, although not definitively proving Moye's lack of involvement in the attack on Francisco, would have been highly probative.

While it is certainly true that any statement by Dunbar would not have established an airtight alibi, such a statement would have provided compelling evidence of Moye's innocence, particularly if Dunbar indicated that he and Moye spoke for a significant part of the fifteen minute time period not accounted for by Scott's statement.

Accordingly, the Court finds that Dunbar's statement was necessary to Moye's defense and that Cote's ruling was not logically related to any correctional goals. Given the significant deprivation facing Moye (i.e. one year in the SHU), and the lack of a convincing rationale for Cote's decision, the balance in this case tilts heavily in plaintiff's favor. Therefore, Cote's refusal to obtain a statement from Dunbar deprived plaintiff of due process.

### C. *Claim Two: Defendant Cote's Assessment of Confidential Informants*

■ Neither the Second Circuit nor the Supreme Court has established a rule concerning how a prison hearing officer is to assess the reliability of information gleaned from confidential sources. Nevertheless, other circuit courts, as well as district courts in the Southern District of New York, have adopted rules requiring the hearing officer to make an independent assessment of confidential witnesses' credibility and/or reliability. *See, e.g., Taylor v. Wallace*, 931 F.2d 698, 701–02 (10th Cir.1991); *Hensley v. Wilson*, 850 F.2d 269, 276–77 (6th Cir.1988); *Russell v. Coughlin*, 774 F.Supp. 189, 196–97 (S.D.N.Y.1991), *rev'd sub nom. on other grounds Russell v. Scully*, No. 92–2057, 1993 WL 188677 (2d Cir. June 4, 1993); *Vasquez v. Coughlin*, 726 F.Supp. 466, 470–71 (S.D.N.Y.1989). The Court agrees with the persuasive reasoning in these cases and adopts this rule.

The parties dispute whether Cote made an independent assessment of the statements given by the confidential informants to the corrections officers. Inasmuch as the record is devoid of any clear indication as to whether Cote independently assessed the credibility and reliability of these confidential witnesses, the Court is presented with a disputed issue of material fact. For this reason, summary judgment on the merits is inappropriate with respect to Claim Two.

### D. *Claim Three: Absolute Quasi–Judicial Immunity for Selsky*

Defendants assert that Selsky is entitled to absolute immunity inasmuch as he served a quasi-judicial function in reviewing and affirming Cote's decision. The Court will review the standards applicable to this assertion and then apply them to the instant matter.

#### 1. *Standards for Granting Absolute Immunity*

It is well established that judges are immune from liability for their judicial acts. *Cleavinger v. Saxner*, 474 U.S. 193, 199–200, 106 S.Ct. 496, 499–500, 88 L.Ed.2d 507 (1985). Absolute immunity applies, " 'however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff.' " *Id.* (quoting *Bradley v. Fisher*, 13 Wall. 335, 347, 20 L.Ed. 646 (1872)).

Absolute immunity for judges engaged in judicial activity dates back to centuries-old English common law and has been adopted by American courts. *Butz v. Economou*, 438 U.S. 478, 508, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978). This form of immunity was established to protect the independence of the judiciary, by allowing judges to perform their functions without the threat of harassment or intimidation. In particular, "[j]udges were often called to decide '[c]ontroversies involving not merely great pecuniary interests, but the liberty and character of the parties, and consequently exciting the deepest feelings.' " *Id.* at 509, 98 S.Ct. at 2912 (quoting *Bradley v. Fisher*, 13 Wall. at 348). If frustrated litigants could maintain a civil suit against a judge, "[j]udges would lose 'that independence without which no judiciary can either

be respectable or useful.'" *Id.* (quoting *Bradley v. Fisher,* 13 Wall. at 347).

There is, however, a fundamental tension between the importance of protecting judicial independence and the principle that "[a]ll the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it." *United States v. Lee,* 106 U.S. 196, 220, 1 S.Ct. 240, 260, 27 L.Ed. 171 (1882) *(quoted in Butz v. Economou,* 438 U.S. at 506, 98 S.Ct. at 2910). It is this tension, as well as a recognition of "the salutary effects that the threat of liability can have," *Forrester v. White,* 484 U.S. 219, 223, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988), that has caused the Supreme Court to be "cautious in recognizing claims that government officials should be free of the obligation to answer for their acts in court." *Id.* at 223–24, 108 S.Ct. at 542.

While absolute immunity has been extended to members of the executive branch who serve a judicial function, qualified immunity, rather than absolute immunity, remains the norm for executive branch officers. *Buckley v. Fitzsimmons,* —— U.S. ——, ——, 113 S.Ct. 2606, 2621, 125 L.Ed.2d 209 (1993). Indeed, courts " 'have been quite sparing in [their] recognition of absolute immunity, and have refused to extend it any further than its justification would warrant.' " *Antoine v. Byers & Anderson, Inc.,* —— U.S. ——, —— n. 4, 113 S.Ct. 2167, 2170 n. 4, 124 L.Ed.2d 391 (1993) (quoting *Burns v. Reed,* —— U.S. ——, ——, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547 (1991)).

■ A government official who seeks absolute immunity bears the burden of showing that overriding public policy considerations justify a deviation from this norm. *Forrester v. White,* 484 U.S. at 224, 108 S.Ct. at 542; *Cleavinger v. Saxner,* 474 U.S. at 201, 106 S.Ct. at 500; *Butz v. Economou,* 438 U.S. at 506, 98 S.Ct. at 2910.

■ In deciding whether a government official is entitled to absolute immunity from a § 1983 suit, a court is to follow a functional approach, which involves evaluating the nature of the act performed by the official in connection with the alleged constitutional or statutory violation. If the official's action was judicial in nature, then absolute immunity applies. The official's rank, title or place within the government is not the determining factor.[7] *Forrester v. White,* 484 U.S. at 227, 108 S.Ct. at 544; *Cleavinger v. Saxner,* 474 U.S. at 201, 106 S.Ct. at 500; *Butz v. Economou,* 438 U.S. at 511, 98 S.Ct. at 2913.

■ When applying the functional test to ascertain whether the government official is acting in an adjudicatory role and is therefore entitled to absolute immunity, the court should consider the following six factors:

(a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Cleavinger v. Saxner,* 474 U.S. at 202, 106 S.Ct. at 501 (citing *Butz v. Economou,* 438 U.S. at 512, 98 S.Ct. at 2913).

Federal hearing officers and administrative law judges are afforded absolute immunity. *Butz v. Economou,* 438 U.S. at 513–14, 98 S.Ct. at 2914–15. The *Butz* court found that the role of the modern federal hearing examiner or administrative law judge was "functionally comparable" to that of a trial judge:

adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suit for damages.... [F]ederal administrative law requires that agency adjudication contain many of the same safeguards as are available in the judicial process. The proceedings are adversary in nature. They are conducted before a trier of fact insulated from politi-

---

7. Indeed, a judge acting in an administrative, rather than a judicial, capacity is not entitled to absolute immunity. *Forrester v. White,* 484 U.S. 219, 108 S.Ct. 538 (state court judge's decision to demote and dismiss a court employee is administrative and thus not protected by absolute immunity).

720

cal influence. A party is entitled to present his case by oral or documentary evidence, and the transcript of testimony and exhibits together with the pleadings constitute the exclusive record for decision. The parties are· entitled to know the findings and conclusions on all of the issues of fact, law, or discretion presented on the record.

*Id.* at 512–13, 98 S.Ct. at 2914 (citations to Administrative Procedure Act omitted).

In addition, the *Butz* court explained that:

the process of agency adjudication is currently structured so as to assure that the hearing examiner exercises his independent judgment on the evidence before him, free from pressures by the parties or other individuals within the agency. Prior to the Administrative Procedure Act, there was considerable concern that persons hearing administrative cases at the trial level could not exercise independent judgment because they were required to perform prosecutorial and investigative functions as well as their judicial work and because they were often *subordinate to executive officials within the agency....* [T]he Administrative Procedure Act contains a number of provisions designed to guarantee the independence of hearing examiners. They may not perform duties inconsistent with their duties as hearing examiners. When conducting a hearing under § 5 of the APA, a hearing examiner is not responsible to, or subject to the supervision or direction of, employees or agents engaged in the performance of investigative or prosecution functions for the agency. Nor may a hearing officer consult any person or party, including other agency officials, concerning a fact at issue in the hearing, unless on notice and opportunity for all parties to participate.... *They may be removed only for good cause established and determined by the Civil Service Commission after a hearing on the record.* Their pay is also controlled by the Civil Service Commission.

*Id.* at 513–14, 98 S.Ct. at 2915 (emphasis added; citations omitted). On the basis of these factors, the *Butz* court held that persons subject to the provisions of the APA are entitled to absolute immunity.

In contrast, the Supreme Court has held that a prison disciplinary board is not entitled to absolute immunity:

We do not perceive the discipline committee's function as a "classic" adjudicatory one.... Surely, the members of the committee, unlike a federal or state judge, are not "independent"; to say that they are is to ignore reality. They are not professional hearing officers, as are administrative law judges. They are, instead, prison officials, albeit no longer of the rank and file, temporarily diverted from their usual duties. They are employees of the Bureau of Prisons and they are the direct subordinates of the warden who reviews their decision. They work with the fellow employee who lodges the charge against the inmate upon whom they sit in judgment. The credibility determination they make often is one between a co-worker and an inmate. They thus are under obvious pressure to resolve a disciplinary dispute in favor of the institution and their fellow employee. It is the old situational problem of the relationship between the keeper and the kept, a relationship that hardly is conducive to a truly adjudicatory performance.

*Cleavinger v. Saxner,* 474 U.S. at 203–04, 106 S.Ct. at 502 (citations omitted); *see also Zavaro v. Coughlin,* 970 F.2d 1148, 1153 n. 2 (2d Cir.1992) ("absolute immunity does not extend to officers presiding at prison disciplinary hearings, in the absence of the procedural safeguards identified by the Supreme Court in *Butz*").

Despite the procedural safeguards present in the disciplinary proceeding at issue in *Cleavinger,* [8] the Supreme Court found that these were not sufficient to place the disciplinary board into a judicial role "of the kind and depth" required for absolute immunity. *Cleavinger v. Saxner,* 474 U.S. at 206, 106

8. These safeguards included prior notice of the hearing, representation by· a prison· staff member, the right to present certain evidence, the right to be present, the requirement of a detailed record, the availability of further administrative review, and the availability of *habeas corpus* review by a federal court. *Cleavinger v. Saxner,* 474 U.S. at 206, 106 S.Ct. at 503.

S.Ct. at 503. Among the missing factors, the *Cleavinger* court noted that the prisoner was afforded neither a lawyer nor an independent, nonstaff representative; had no right to compel the attendance of witnesses or to cross-examine those called as witnesses; had no right to discovery; and did not receive a verbatim transcript. Furthermore, there was no cognizable burden of proof and hearsay testimony was permitted. *Id.*

### 2. *Application of Standards to Selsky*

 The Court now considers defendants' argument in light of the six factor analysis identified in *Cleavinger.* As an initial matter, there can be little doubt, in the prison context, that an appellate hearing officer must be permitted to perform his functions without harassment or intimidation. This Court and others have seen numerous "harassment" lawsuits filed by inmates. *See Cleavinger v. Saxner,* 474 U.S. at 203, 106 S.Ct. at 501 ("We also acknowledge that many inmates do not refrain from harassment and intimidation. The number of non-meritorious prisoners' cases that come to this Court's notice is evidence of this.")

Nevertheless, this Court has before it no evidence that defendant Selsky has been harassed or intimidated by lawsuits brought against him in his capacity as the DOCS Director of Inmate Discipline. Furthermore, the existence of qualified immunity and "firm application of the Federal Rules of Civil Procedure will ensure that federal officials are not harassed by frivolous lawsuits." *Butz v. Economou,* 438 U.S. at 507–08, 98 S.Ct. at 2911, *quoted in Cleavinger v. Saxner,* 474 U.S. at 206–07, 106 S.Ct. at 503–04. The same may be said of state officials sued in federal court under 42 U.S.C. § 1983.

The second factor to be considered is the presence of procedural safeguards that reduce the need for § 1983–type actions as a means of controlling unconstitutional conduct. As discussed *supra,* the *Cleavinger* court found that, despite the existence of certain procedural protections, such as prior notice of the hearing, representation by a prison staff member, the limited right to present evidence, the right to be present at

the hearing, the requirement of a detailed record and the availability of further administrative review, there were still not enough procedural safeguards to justify extension of absolute immunity to a prison disciplinary board.

The Court focussed on the fact that the prisoner was afforded neither a lawyer nor an independent, nonstaff representative; had no right to compel the attendance of witnesses or to cross-examine those called as witnesses; had no right to discovery; and did not receive a verbatim transcript. Furthermore, there was no cognizable burden of proof and hearsay testimony was permitted. *Cleavinger v. Saxner,* 474 U.S. at 206, 106 S.Ct. at 503.

With one exception,[9] the procedural framework for an inmate appearing before the DOCS disciplinary board suffers from the same shortcomings as did the procedural framework found in *Cleavinger.* For example, such hearings rely heavily on hearsay, including unverifiable information from prison guards and informants. This lack of evidentiary rigor is in stark contrast to the strict evidentiary standards required in judicial proceedings. *Cf.* Julio A. Thompson, Note, *A Board Does Not a Bench Make: Denying Quasi–Judicial Immunity to Parole Board Members in Section 1983 Damages Actions,* 87 Mich.L.Rev. 241, 250–51 (1988) (arguing that parole board members are not entitled to absolute quasi-judicial immunity because, *inter alia,* parole board proceedings lack the evidentiary rigor of judicial proceedings).

These shortcomings were not cured by the administrative appeal to Selsky, who relied upon the same evidence (and, in the case of Dunbar, lack of evidence) considered by Cote. Thus, while the administrative appeal provided an extra level of review, Moye was not afforded any *additional* procedural safeguards in terms of the introduction of evidence or the assistance of outside counsel.

In light of this fact, it would be inequitable and inconsistent to afford the appellate officer absolute immunity while granting the

---

**9.** An inmate does receive a copy of the hearing transcript.

hearing officer the more limited protection of qualified immunity. While their rank within DOCS is different, their function is, for purposes of this analysis, is similar. *See Buckley v. Fitzsimmons,* —— U.S. at ——, 113 S.Ct. at 2624 (Kennedy, J., concurring in part and dissenting in part) ("one of the unquestioned goals of our § 1983 immunity jurisprudence [is] ensuring parity in treatment among state actors engaged in identical functions"); *see also id.* at ——, 113 S.Ct. at 2621 (when prosecutor and police officer perform similar functions, it is " 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.' ") (quoting *Hampton v. Chicago,* 484 F.2d 602, 608 (7th Cir.1973), *cert. denied,* 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974)); *Burns v. Reed,* —— U.S. at ——, 111 S.Ct. at 1944 ("it is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice."); *Forrester v. White,* 484 U.S. at 229, 108 S.Ct. at 545 ("a judge who hires or fires a probation officer cannot meaningfully be distinguished from a district attorney who hires and fires assistant district attorneys").

The third *Cleavinger* factor concerns insulation from external influence. Selsky's assertion of insulation notwithstanding, the "relationship between the keeper and the kept," *Cleavinger v. Saxner,* 474 U.S. at 204, 106 S.Ct. at 502, is present in the DOCS appellate procedure. As Chief Judge Winter of the Fourth Circuit wrote in dissent in a pre-*Cleavinger* case,

> The majority finds the safeguards here in a prisoner's right to appeal an adverse disciplinary action to ... an officer of the central state administration of the prison

system. To me this "safeguard" is more illusory than real.... [T]he state department administering the prison system [cannot] be expected to function as an impartial arbiter of conflicts between the institutional interests of the prisons and the rights of inmates. Without impugning the competence or integrity of prison administrators, I am unable to view this system of review as a reliable check on the discretion of prison disciplinary committees....

*Ward v. Johnson,* 690 F.2d 1098, 1115 (4th Cir.1982) (en banc) (Winter, C.J., dissenting).

Selsky lacks independence in two ways. First, unlike the hearing officers in *Butz,* who were subject to removal only by a neutral body,[10] Selsky is subordinate to, and subject to removal by, his superiors at DOCS. *Cf. Butz v. Economou,* 438 U.S. at 513–14, 98 S.Ct. at 2914 ("Prior to the Administrative Procedure Act, there was considerable concern that persons hearing administrative cases at the trial level could not exercise independent judgment because they were required to perform prosecutorial and investigative functions as well as their judicial work, and because they were often *subordinate to executive officials within the agency* ") (citations omitted; emphasis added). While Selsky is not a subordinate of any facility superintendent, as were the defendants in *Cleavinger,* he is a direct subordinate of the DOCS Deputy Commissioner for Correctional Facilities and, ultimately, of course, the DOCS Commissioner.

Second, Selsky provides general advice to facility staff on how properly to conduct a disciplinary hearing, and also answers specific inquiries that arise during the course of a hearing.[11] This raises the possibility that

---

**10.** The hearing officers in *Butz* could only be removed for good cause by the Civil Service Commission after a hearing on the record. 5 U.S.C. § 7521. In addition, their pay was controlled by the Civil Service Commission. *Butz v. Economou,* 438 U.S. at 514, 98 S.Ct. at 2914.

**11.** In his deposition in another matter, Selsky engaged in the following colloquy:

Q: When you say that you provide technical assistance, what does that consist of?
A: Well, my office kind of serves a role of a kind of sounding board sometimes for facility staff. They may have a particular case that

they are dealing with, they may make a phone call to us and, you know, just ask how to deal with a particular issue. It may not be a case currently ongoing, it may be in preparation of doing a hearing or something like that, they may just ask our advice, you know, not providing testimony or anything like that, just kind of using the experience that we have developed over the years to help them do the hearing properly.
Q: So, sometimes you get calls either prior to a hearing and sometimes you get calls during the course of a hearing?
A: Yes, that's correct.

Selsky might be asked on appeal to reverse a ruling made at a disciplinary hearing by facility staff who solicited and relied on Selsky's advice in the matter. In essence, Selsky would be asked to reverse himself. This would not be an independent determination.

Defendants have filed an affidavit of Thomas A. Coughlin III, Commissioner of DOCS ("the Commissioner"), in which the Commissioner indicates that Selsky is permitted to exercise his independent judgment, free from institutional pressures.[12] Although this Court has not been presented with any evidence that Selsky has been *directly* pressured by the Commissioner or any other superior to decide appeals in a certain way, the Court is not prepared to say that other, more subtle forms of pressure might not influence Selsky's decision-making processes. The simple fact that Selsky serves at the pleasure of superiors within DOCS creates a dependence upon the goodwill of these officials, who may, on occasion, place institutional interests above the rights of inmates.

Accordingly, the fact that Selsky's "work performance is not reviewable by anyone whose decisions or actions would be before him on an appeal," Coughlin Aff. ¶ 10, offers only a partial guarantee of independence. Selsky may be asked to rule on the application of institution-wide practices or procedures in which his superiors have a direct interest. Thus, despite the existence of certain institutional safeguards, Selsky still serves at the pleasure of the "keepers" and his judgment cannot be truly independent.

As for the importance of precedent, the Commissioner has indicated that Selsky considers the facts from the disciplinary hearing "in relation to regulations, administrative precedent, and relevant case law." Coughlin Aff. ¶ 5. This assertion is undisputed by plaintiff. Therefore, in this regard, Selsky does serve a judicial function.

As noted above, neither the disciplinary hearing nor the appeal can be characterized as fully adversarial in nature. Inmates may not be represented by counsel and lack many opportunities to cross-examine and challenge witnesses and other evidence presented by DOCS officers and confidential informants.

As for *Cleavinger*'s sixth factor—the correctability of error on appeal—it has been noted that, "[i]njunctive or declaratory relief is useless to a person who has already been injured. 'For [such persons] it is damages or nothing.'" *Butz v. Economou*, 438 U.S. at 504–05, 98 S.Ct. at 2910 (quoting *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 410, 91 S.Ct. 1999, 2012, 29 L.Ed.2d 619 (1971)). Moye's 323 days in the SHU, in violation of his due process rights, were an injury which could not be cured by injunctive or declaratory relief and so it is "damages or nothing."

The Court is aware that two other federal judges in New York State have found that Selsky is entitled to absolute immunity. *See Parkinson v. Employee Assistant,* No. 91 Civ. 7401(KMW), 1993 WL 118451 (S.D.N.Y. Apr. 12, 1993); *Pacheco v. Kihl,* No. CIV–90–

---

Q: Do you ever get calls sort of about a problem that somebody at the facility, or on an issue that somebody at the facility level has spotted about the conduct of these hearings and they want your advice or suggestion on how to proceed?
A: I'm sure there have been instances where that has occurred, yes.
Reply Memorandum Ex. B at 11 (Deposition of Donald Selsky, conducted on December 2, 1992 in connection with *Allah v. Mann,* 90–CV–1370 (N.D.N.Y.)).

12. The affidavit states, in relevant part,
[Selsky's] appellate decisions are only subject to outside judicial review and are completely insulated from institutional pressures within DOCS. The Appeals procedure Regulation, which I approved, is designed to permit [Selsky] to exercise his independent judgment.

I do not involve myself in the appeals process. Nor do I review [Selsky's] appellate dispositions individually. I have assigned [Selsky's] operational duties and his administrative authority with an intent to preserve his judicial independence....
[Selsky] is not subordinate to any prison superintendent. Nor does he supervise the individual hearing officers who conduct Tier III Hearings. Thus, his work performance is not reviewable by anyone whose decisions or actions would be before him on appeal. Nor is evaluation of his performance affected by how many or which appeals he affirms or reverses.
Coughlin Aff. ¶¶ 8–10 (originally filed in *Parkinson v. Employee Assistant,* No. 91 Civ. 7401(KMW), 1993 WL 118451 (S.D.N.Y.)).

549T (W.D.N.Y. Dec. 17, 1991). Nevertheless, upon a careful application of the six *Cleavinger* factors to the DOCS inmate appeals procedure, this Court cannot agree with the conclusions reached by these colleagues. Accordingly, this Court finds Selsky is not entitled to absolute immunity.

### E. *Effect of the Subsequent Article 78 Proceeding*

■ Defendants assert that the reversal of Cote's and Selsky's rulings in a subsequent Article 78 proceeding cured any due process violation suffered by Moye in his DOCS proceedings and that he therefore is not entitled to recover under § 1983.

The applicable case law does not support this conclusion. The Second Circuit has recently held that, "an inmate is not deprived of due process where an *administrative* appeal has cured a hearing's procedural defects." *Russell v. Scully*, No. 92–2057, 1993 WL 188677, at *3 (2d Cir. June 4, 1993) (emphasis added) (citing *Young v. Hoffman*, 970 F.2d 1154, 1156 (2d Cir.1992); *Williams v. Tavormina*, No. 89–1247T, 1992 WL 487335, 1992 U.S.Dist. LEXIS 21170 (W.D.N.Y. Aug. 28, 1992)). The rationale for this ruling was explained in *Young:* "We believe that, as a policy matter, this possibility of cure *through the administrative appeals process* will encourage prison administrators to correct errors as an alternative to forcing inmates to seek relief in state or federal courts." *Young v. Hoffman*, 970 F.2d at 1156 (emphasis added) (citing *Harper v. Lee*, 938 F.2d 104, 105 (8th Cir.1991)).

Moye was required to resort to an Article 78 proceeding in state court in order to obtain a reversal of the DOCS rulings. Inasmuch as the holdings in *Russell* and *Young* apply only when due process violations are cured through the *administrative appeals* process, they are not controlling in the instant action. Defendants' argument on this point must be rejected.[13]

### F. *Qualified Immunity*

■ The standards for invoking the qualified immunity defense in the Second Circuit are well established. Public officials are entitled to qualified immunity from liability for damages if their conduct does not violate a clearly established statutory or constitutional right. *Weg v. Macchiarola*, 995 F.2d 15, 17 (2d Cir.1993). In order to receive this protection, a public official must demonstrate that it was objectively reasonable to believe that his or her conduct did not violate the clearly established right. *Id.* The Court is to look at what was clearly established at the time the action took place. *Id.*

■ In determining whether a particular right was clearly established at the time the allegedly unconstitutional acts took place, this Court must consider three factors:

(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Gan v. City of New York*, No. 92–7971, 1993 WL 184198, at *9 (2d Cir. June 1, 1993) (citing *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992)).

In addition, defendants, as "'reasonably competent public official[s]' are presumed to have known 'the law governing [their] conduct' in these matters. *Harlow v. Fitzger-*

---

13. In connection with their discussion on this point, defendants note that the *Russell* court found that administrative confinement pending appeal is not a deprivation of liberty. *See Russell v. Scully*, 1993 WL 188677, at *2. Defendants claim that Moye's 323 days in the SHU were administrative, not punitive, confinement and therefore assert that Moye suffered no deprivation of liberty under § 1983. Letter from Barbara B. Butler, Asst. Att'y Gen., to Judge Robert J. Ward (June 14, 1993) at 2.

Plaintiff argues that the confinement was punitive, inasmuch as there is no administrative justification for Moye's loss of other privileges such as access to the telephone, commissary or packages. In addition, plaintiff points to the fact that there was no periodic review of plaintiff's segregation, as is required in the case of administrative confinement.

For the reasons stated by plaintiff, the Court finds that Moye's confinement was punitive.

*ald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). They 'are charged with knowledge of relevant decisional law, especially the decisions of the circuit in which they perform their official duties.' *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989)." *McCormack v. Cheers,* 818 F.Supp. 584, 599 (S.D.N.Y.1993).

Finally, "[b]ecause the defense of qualified immunity is designed to relieve government officials of the burdens of litigation as well as of the threat of damages, summary judgment is encouraged as a device for disposing of claims barred by qualified immunity." *Gan v. City of New York,* 1993 WL 184198, at *10.

With these principles in mind, the Court will consider defendants' assertion that they are entitled to qualified immunity with respect to plaintiff's claims on both the exclusion of Dunbar and the assessment of confidential informants.

### 1. *Exclusion of a Witness*

■ At the time of Moye's hearing in March 1988, Cote and Selsky were on notice that witnesses should be permitted to give statements in prison disciplinary hearings unless there is a reason to exclude such statements which is logically related to protecting institutional safety or advancing other correctional goals. This Court has previously held that such a rule was clearly established in *Ponte v. Real,* which was decided by the Supreme Court in 1985. *See Scott v. Coughlin,* No. 89 Civ. 8436(RJW), slip op. at 18 (S.D.N.Y. Mar. 19, 1991) (citing *Fox v. Coughlin,* 893 F.2d 475, 478 (2d Cir.1990)). Thus, at the time of the hearing, no reasonable official could believe that denying Dunbar the right to testify, in the absence of threats to institutional safety or correctional goals, did not violate a clearly established constitutional right. Accordingly, qualified immunity is not available to defendants on Claims One and Three.

### 2. *Assessment of Confidential Informants*

■ As indicated above, neither the Second Circuit nor the Supreme Court has established a rule concerning how prison disciplinary boards are to assess the reliability of information provided by confidential informants. Thus, the second factor discussed in *Gan,* "whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question," *Gan v. City of New York,* 1993 WL 184198, at *9, tilts strongly in favor of defendants.

The lack of decisional law precisely on point does not fully dispose of the matter. In *Weber v. Dell,* 804 F.2d 796 (2d Cir.1986), *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987), the Second Circuit held that a 1982 strip/body cavity search of an arrestee without reasonable suspicion that he was concealing a weapon or contraband violated the Fourth Amendment and that officials who conducted the search were not entitled to qualified immunity, despite the fact that the Second Circuit had not yet ruled on whether such searches were constitutional. The Second Circuit had, however, previously condemned the practice and, at the time of the search at issue in *Weber,* three other circuits had held such searches to be unconstitutional. *Id.* at 801 n. 6, 803; *see also Shabazz v. Coughlin,* 852 F.2d 697, 701 (2d Cir.1988) (discussing *Weber* ). Thus, under certain circumstances, a right can be clearly established even in the absence of a specific ruling by the Second Circuit or Supreme Court.

Upon a review of the existing case law in March 1988, this Court finds that the right to have an independent assessment of confidential informants was not clearly established at the time of the hearing. Other courts in this district are divided over whether this right was clearly established by March 1988. *Compare Howard v. Wilkerson,* 768 F.Supp. 1002, 1008 (S.D.N.Y.1991) (right clearly established by October 1984) *and Vasquez v. Coughlin,* 726 F.Supp. 466, 472 (S.D.N.Y. 1989) (right clearly established by 1986) *and Russell v. Coughlin,* 774 F.Supp. 189, 199 (S.D.N.Y.1991) (adopting *Vasquez* approach), *rev'd sub nom. on other grounds Russell v. Scully,* No. 92–2057, 1993 WL 188677 (2d Cir. June 4, 1993) *with Gittens v. Sullivan,* 720 F.Supp. 40, 43–44 (S.D.N.Y.1989) (at time of Gittens's hearing in January 1988, right was not clearly established).

The court in *Russell v. Coughlin* cited to four pre–1988 cases in which other circuits held that there was a constitutional right to independent assessment of confidential informants' credibility and reliability. *Russell v. Coughlin,* 774 F.Supp. at 196 (citing *Dawson v. Smith,* 719 F.2d 896 (7th Cir.1983); *Kyle v. Hanberry,* 677 F.2d 1386 (11th Cir.1982); *Smith v. Rabalais,* 659 F.2d 539, 540–42 (5th Cir.1981), *cert. denied,* 455 U.S. 992, 102 S.Ct. 1619, 71 L.Ed.2d 853 (1982); *Helms v. Hewitt,* 655 F.2d 487, 502 (3d Cir.1981), *rev'd on other grounds,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)).

However, in March 1988, not all circuits agreed that there was such a right. As the Third Circuit noted in *Helms,* "[o]ther courts of appeals, faced with claims similar to those pressed here, have read *Wolff* to command almost complete deference to the judgment of prison officials on the need, if any, for administrative inquiry into the credibility and reliability of an informant." *Helms v. Hewitt,* 655 F.2d at 501 (citing *Walker v. Hughes,* 558 F.2d 1247, 1259 (6th Cir.1977); *McLaughlin v. Hall,* 520 F.2d 382, 384–85 (1st Cir.1975); *Willis v. Ciccone,* 506 F.2d 1011, 1018 (8th Cir.1974)). Thus, while the *Helms* court did not adopt the approach established in the First, Sixth and Eighth Circuits, it did acknowledge the split between circuits on this issue.

In light of this intercircuit split and the Second Circuit's silence on the issue, the right to have an independent assessment of the credibility and reliability of confidential informants was not clearly established at the time of Moye's hearing. Accordingly, Cote is entitled to qualified immunity with respect to Claim Two.

## CONCLUSION

Plaintiff's motion for partial summary judgment is granted. Defendants' motion for summary judgment is granted in part and denied in part. That part of defendants' motion which seeks to dismiss Claims One and Three of the Amended Complaint is denied, while that part of the motion which seeks to dismiss claim Two is granted.

The parties are directed to complete discovery with respect to any remaining issues, including damages incurred in connection with Claims One and Three, by September 3, 1993 and to file a joint pre-trial order by October 1, 1993.

It is so ordered.