**Philip SHADDY, Plaintiff,**

v.

**Frank O. GUNTER, et al., Defendants.**

**No. CV87–L–323.**

United States District Court,
D. Nebraska.

Aug. 8, 1988.

Robert F. Bartle, Lincoln, Neb., for plaintiff.

Mark D. Starr, Asst. Atty. Gen., Lincoln, Neb., for defendants.

## MEMORANDUM OF DECISION

URBOM, District Judge.

Philip Shaddy, an inmate at the Nebraska State Penitentiary ("NSP"), has filed an action under 42 U.S.C. § 1983, challenging an operational memorandum ("OM") that outlines the institution's visitation policy as unconstitutionally vague. Operational memoranda are rules tailored to the unique needs of individual facilities within the Department of Correctional Services and derived from administrative regulations promulgated by the director of that department ("DCS"). In pertinent part, the NSP's visitation OM states that "[a]n embrace and a kiss at the beginning and end of each visit are allowed. Kissing, caressing and fondling during visits are strictly forbidden." OM 205.1.102, IV(E)5, Exhibit 8.

Shaddy's *pro se* complaint refers to only one misconduct report, dated April 2, 1987. The report, which was completed by correc-

tional officer John Anderson, states that Shaddy had put his hands on his wife's buttocks and squeezed her while he kissed her. The disciplinary committee, composed of defendants A.W. Knight, Mario Peart and Richard Mulder, conducted a hearing on April 24, 1987, to investigate the report and concluded that Shaddy had violated the OM and imposed upon him a 30–day restriction on visitations with his wife. Exhibit 2.

Shaddy appealed the disciplinary committee's determination and the appeals board upheld the actions of the disciplinary committee. Exhibit 4. The appeals board found that substantial evidence existed to support a finding that Shaddy had violated the O.M. and that due process was afforded to Shaddy at the hearing. Exhibit 5. The defendants Laurie Smith Camp, Gene Hruza and Bruce Kramer were the members of the appeal board.

At trial Shaddy provided evidence that he also was reported for misconduct during a visit with his wife on April 22, 1987, for which his visitation privileges were restricted for an additional 30 days. The subsequent misconduct report indicated that Shaddy had squeezed and patted his wife on the buttocks as she was leaving the visitation room. Exhibit 13. A misconduct report on another inmate, Rick Roewert, was received into evidence. Exhibit 10. The report on Roewert indicates that Roewert and a female visitor, which Roewert testified was his wife, were touching, hugging and that he was rubbing her leg throughout their visit, all in violation of the OM. Following a disciplinary hearing, punishment was imposed upon Roewert for violating the visitation OM.

Admittedly, there is some discrepancy about whether Shaddy was squeezing his wife's buttocks during their April 2nd visit. Shaddy and his wife, Kathy, testified that he did not squeeze her buttocks, but rather that he rested his fingers on the top portion of Kathy's buttocks. However, this issue is not material to the issue raised in this lawsuit. The job of the disciplinary committee is to make factual findings regarding misconduct reports and to determine whether restrictions on privileges are war-

ranted if a violation is found. My job is to decide whether the OM is void for vagueness.

■ It is not clear from Shaddy's complaint whether his challenge to the OM is facial or otherwise. However, the indication at trial was that the plaintiff believes the OM to be facially invalid. Thus, I turn to the statement made by the Supreme Court *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.* 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982), and recently reiterated in *City of Houston v. Hill,* —— U.S. ——, ——, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987):

> In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.

*Id.* Although the magistrate has previously determined that Shaddy had a limited liberty interest in visitation with his wife, filing 3, page 2, I do not conclude that the OM at issue here reaches a "substantial amount of constitutionally protected conduct."

The void for vagueness doctrine was well explained in *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972), wherein the Court stated:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.

*Id.*

The Eighth Circuit has stated that "[a] law is void for vagueness if it lacks 'ascertainable standards of guilt', such that 'men of common intelligence must necessarily guess at its meaning and differ as to its application.' Vague laws offend due process because they violate the two essential values of fair warning and nondiscriminatory enforcement." *Garner v. White,* 726 F.2d 1274, 1277 (8th Cir.1984) (quoting the United States Supreme Court). I note at the outset the obvious distinction between Shaddy's challenge, which is to a prison rule, and the *Grayned* and *Garner* plaintiffs' challenges, which were to statutes.

While it is true that parts of the OM could have been more artfully drafted, I find that my conclusion need not necessarily be that the OM is unconstitutionally vague. The general principles of *Grayned* are tempered by cases such as *Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 2561, 41 L.Ed.2d 439 (1974) and *White Eagle v. Storie,* 456 F.Supp. 302, 307 (D.Neb.1978). The plaintiff in *Parker* was an officer in the armed services who was convicted of conduct "unbecoming an officer and a gentleman" in violation of the Uniform Code of Military Justice, and who challenged that portion of the Code as unconstitutionally vague. The Court stated that "[b]ecause of the factors differentiating military society from civilian society, we hold that the proper standard of review for a vagueness challenge to the articles of the Code is the standard which applies to criminal statutes regulating economic affairs." *Id.* The Court continued, quoting *United States v. National Dairy Corp.,* 372 U.S. 29, 32–33, 83 S.Ct. 594, 597–98, 9 L.Ed.2d 561 (1963):

> The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language.

*Id.* 417 U.S. at 757, 94 S.Ct. at 2562. Even more to the point is the *White Eagle* court's determination that the vagueness doctrine should not be as stringently applied in correctional facility settings. The court stated:

> [T]he Court is reluctant to enmesh itself in the day-to-day operations of a penal

institution, especially in matters relating to discipline and internal administration. Instead, the Court is convinced this issue is sufficiently disposed of by the language of Circuit Judge Van Dusen ...:

> Due process undoubtedly requires certain minimal standards of specificity in prison regulations, but we reject the view that the degree of specificity required of such regulations is as strict in every instance as that required of ordinary criminal sanctions. This results from the fundamental difference between normal society and prison society. The maintenance of strict security and discipline, with its unfortunate but unavoidable circumscription of an inmates's freedom to act, is essential to safe and efficient prison administration.

*White Eagle,* 456 F.Supp. at 309, quoting *Meyers v. Alldredge,* 492 F.2d 296, 310 (3rd Cir.1974) (citations omitted).

Guided by the holdings of *Parker* and *White Eagle,* I find that the OM that outlines the NSP's visitation policies is not impermissibly vague. The OM includes the follow provisions: 1) "it is the responsibility of the visitor and the inmate to conduct themselves in a manner that will not bring discredit upon them or be disruptive to other visits in the area"; 2) "[v]isitors and inmates must accept responsibility to behave in a mature, responsible manner, respectful of the rights of other offenders and their visitors"; 3) "[v]isitors and inmates may hold hands so long as the hands are in full view and the hand holding is not improper or indecorous;" 4) "[v]isitors and inmates *may not* sit with arm or arms around each other; " and 5) "[v]isitors and inmates *may* sit with an arm on the back of the opposite chair." Exhibit 8 (emphasis original).

Taken in context of the entire rule, I find that the OM provides sufficient guidance to Shaddy and other inmates to put them on notice that, with the exception of a kiss and an embrace at the beginning and end of each visit, physical contact in a manner more intimate than hand-holding during visitation is prohibited under the rule.

Squeezing a visitor's buttocks does not constitute a kiss or an embracing or a hand-holding.

■ Shaddy attempted to show at trial that the OM had been arbitrarily enforced. Shaddy and Roewert testified that whether certain conduct during visitations was in violation of the OM depended upon which correctional officer was on duty. They testified that some correctional officers would complete misconduct report on a person for certain conduct and other correctional officers who observe the same conduct would not complete a misconduct reporting form. Though the guards who are stationed in the visitation room are empowered to complete misconduct reporting forms, the guards are not the true enforcement arm of the NSP's OMs.

After a misconduct reporting form is completed, a disciplinary committee holds a hearing to gather evidence and hear testimony to determine whether there is evidence to support a finding of guilt. The inmate is permitted to speak to the disciplinary committee, to request witnesses and to provide documentary evidence. These procedural safeguards were followed by the disciplinary committee that considered Shaddy's misconduct report. The disciplinary committee found that Shaddy had squeezed his wife's buttocks during a visitation period and, based on the act of squeezing, found him guilty of the misconduct reported on the form. Accordingly, restrictions on his visitation were imposed upon him. At trial, the plaintiff presented no evidence to show that the NSP's disciplinary committees have arbitrarily or indiscriminately enforced the visitation OM, nor did he attempt to provide evidence to demonstrate that the potential for arbitrary enforcement exists at the disciplinary committee level.

■ In any event, all the defendants are entitled to qualified immunity for their part in the events that constitute the basis of this action. The Supreme Court in *Anderson v. Creighton,* —— U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), explained:

[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful action generally turns on the objective legal reasonableness of the action, ... assessed in light of the legal rules that were clearly established at the time it was taken.

*Id.* at ——, 107 S.Ct. at 3036. Based on the foregoing analysis of cases concerning vagueness challenges, particularly on the *White Eagle* case, I do not find that Shaddy had a right, firmly established in the law, to be subject to a rule composed with more explicit language. Accordingly, I conclude that the defendants acted with objective legal reasonableness in following their disciplinary procedure upon receiving officer Anderson's misconduct reporting form, and are therefore entitled to immunity from money damages in their personal capacities. Moreover, it is clear under *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 29–30, 101 S.Ct. 1531, 1546–47, 67 L.Ed.2d 694 (1981) that the defendants are entitled to immunity from money damages under the eleventh amendment in their official capacities.

■ Because the plaintiff has asked not only for damages, but also for injunctive relief, I address the defendants argument that at least some of them are entitled to absolute immunity. Based upon the Supreme Court's reasoning in *Cleavinger v. Saxner*, 474 U.S. 193, 199–204, 106 S.Ct. 496, 499–503, 88 L.Ed.2d 507 (1985), I find that the members of the appeals board, Camp, Hruza and Kramer, are entitled to absolute, as well as qualified, immunity.

After being sued based upon their actions as members of a disciplinary committee at a prison, the *Cleavinger* defendants sought the protection of absolute immunity. When the case reached the Supreme Court, the Court discussed the history of judicial immunity and explained that it had "extended absolute immunity to certain others who perform functions closely associated with the judicial process," citing prosecutors, grand jurors, and witnesses in judicial proceedings as examples. The court explained that it follows a "function-

al" approach to immunity law, stating that "[a]bsolute immunity flows not from rank or title or 'location with in the Government,' but from the nature of the responsibilities of the individual official." *Id.* at 201, 106 S.Ct. at 501. The Court then listed six factors that should be considered in determining whether to extend absolute immunity:

(a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Id.* at 202, 106 S.Ct. at 501, citing *Butz v. Economou*, 438 U.S. 478, 512, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978).

The *Cleavinger* Court analyzed these factors in relation to the nature of the disciplinary committee members' responsibilities and found that the function of the committee members did not warrant absolute immunity. The Court recognized that the committee members performed an adjudicatory function in determining whether the accused inmate is guilty, by hearing testimony, by receiving evidence, by making credibility determinations and by rendering decisions. The Court also acknowledged the presence of some societal importance in the committee's dispute-resolution function in terms of the efficient and safe administration of the prison. It noted that many inmates are not reluctant to harass or intimidate those persons who act on disciplinary committees, *i.e.*, by filing nonmeritorious claims, and the court recognized that most of the members who serve on disciplinary committees are persons of modest means who, when faced with the possibility of personal liability, will be disinclined to serve. I believe that these observations can be accurately made in reference to the operations of the DCS's appeals board. However, the appeals board members' position and function are sufficiently distinct from the *Cleavinger* defendants'

position and function to warrant a different outcome on the absolute immunity issue.

One of the primary reasons that the Supreme Court gave for not affording the members of the disciplinary committee absolute immunity was because they were not as "independent" as other persons to whom the Court has extended the protection of absolute immunity. The Court noted that the disciplinary committee members are not professional hearing officers, but rather that they are prison officials who are "temporarily diverted from their usual duties." Further, the Court found that the committee members are employees of the Bureau of Prisons, that they are direct subordinates to the warden of the prison, and that the warden reviews their decisions. The Court also found that the committee members lack the requisite independence in part because they must work with the employees who have lodged the charges against the inmates and, along the same line, the committee members must make credibility findings between the inmates and their co-workers. These same problem areas are not present in the case of the appeals board members at the NSP.

The chairperson of the board, Laurie Smith Camp, testified at trial that the board is responsible for reviewing all appeals taken inmates, who may be housed at any of the correctional facilities under the direction of the DCS, that are based upon determinations made by the disciplinary committees. She said that at the present time, roughly 10 percent of the disciplinary committee's decisions are appealed each year. Last year the board considered 666 appeals. She stated that as general counsel for the DCS, she has no direct daily contact with the inmate population. She said that she had not seen Shaddy prior to the trial of this action—his appeal, and his evidence in support of the appeal, were submitted in writing. Further, Camp stated that Hruza, as the department's educational coordinator, and Kramer, as the department's training officer, has some contact with the inmate population, though the contact is not on a regular or routine basis.

Camp explained that neither she nor Hruza, or Kramer has regular contact with the employees of the correctional facilities. The board members' offices are located on the campus of the Lincoln Regional Center, separate from any inmate housing facility. The only contact that she has with persons working at the NSP, such as the other defendants named in this action, is when she is giving a training seminar on legal matters. She also testified that inmates may appeal the board's determination to the district courts of Nebraska. I note that a petition in error may be taken by the inmate pursuant to Neb.Rev.Stats. §§ 25–1901 to 1908 (Reissue 1985).

Based on these considerations, I conclude that the *Cleavinger* Court's concerns regarding the independence of the disciplinary committee are not present with regard to the DCS's appeals board. Unlike the *Cleavinger* defendants who the Court found were "temporarily diverted from their usual duties," the members of the appeals board serve on the board as part of their regular duties. The appeals board members are not placed in the uncomfortable position of making credibility determinations between co-workers and inmates since they do not have regular contact with either the facilities' workers or the inmates. Further, the board's decisions are not reviewable by the chief executive officer of any of the correctional facilities, but rather, are reviewable by the Nebraska courts. These differences lead me to conclude that the appeals board members should be afforded the protection of absolute immunity.