**Jerry YOUNG a/k/a Ramadan,**
**Plaintiff–Appellant,**

v.

**Donald SELSKY, P. Orengo, R. Althouse,**
**R.J. Cunningham, D. Schaller, L.**
**Jewett, Defendants–Appellees.**

No. 1117, Docket 93–2567.

United States Court of Appeals,
Second Circuit.

Originally Submitted Pro Se April 26, 1994.

Final submission after appointment
of counsel for appellant
Sept. 14, 1994.

Decided Nov. 21, 1994.

---

Stephen M. Latimer, New York City, Prisoners' Legal Services of New York, Inc., David C. Leven, of counsel, Laila Ghabrial, Law Student, on the brief, for plaintiff-appellant.

G. Oliver Koppell, Albany, NY Atty. Gen. of the State of N.Y. (Peter H. Schiff, Deputy Sol. Gen., Peter G. Crary, and Martin A. Hotvet, Asst. Attys. Gen., of counsel), for appellees.

Before: FEINBERG, VAN GRAAFEILAND and WINTER, Circuit Judges.

FEINBERG, Circuit Judge:

Jerry Young, also known as Ramadan, appeals from an order entered in July 1993 in the United States District Court for the Northern District of New York, Neal P. McCurn, J. The order approved the Report–Recommendation (the Report) of Magistrate Judge Gustave J. DiBianco filed in June 1993 and dismissed plaintiff Young's complaint under 42 U.S.C. § 1983 against defendant-appellee Selsky. The court held that plaintiff could not press his claim against defendant because of defendant's absolute immunity from suit. For reasons set forth below, we reverse the decision of the district court and remand for further proceedings.

## I. Background

In February through May 1992, plaintiff was a prisoner in the Eastern Correctional Facility in Napanoch, New York, which is operated by the New York State Department of Correctional Services (DOCS). He brought this action, pro se, to challenge disciplinary proceedings conducted in that facility. Defendant Selsky is the Director of the

Office of Special Housing and Inmate Disciplinary Programs for DOCS. He has been designated by the Commissioner of DOCS as the sole designee to hear prisoners' appeals of decisions rendered by DOCS disciplinary hearing officers in cases involving the most serious disciplinary offenses, so-called Tier III superintendent's hearings. 7 N.Y.Comp. Codes R. & Regs. (7 NYCRR) § 254.8; *Moye v. Selsky*, 826 F.Supp. 712, 714 (S.D.N.Y.1993). Selsky held this position at the time of Young's disciplinary proceedings and continues to serve in this capacity as of the writing of this opinion.

This litigation stems from disciplinary actions taken against plaintiff Young in the first half of 1992. In five separate hearings, prison hearing officers found plaintiff guilty of violating various Misbehavior Rules. Plaintiff was sentenced to punitive segregation in the prison's Special Housing Unit (SHU) and was deprived of inmate privileges. SHU prisoners are confined in "single-occupancy cells grouped so as to provide separation from the general population." *Walker v. Bates*, 23 F.3d 652, 655 (2d Cir.1994), *petition for cert. filed*, 63 USLW 3092 (July 25, 1994). SHU prisoners may possess only limited personal belongings and prison issue items. Their privileges to use the telephone or receive packages are limited as well.

Young appealed each decision to Selsky, who affirmed in each case. Over the course of the hearings, Young had asked to call 31 inmates and two staff officers as witnesses. He contends that the hearing officers in each case denied his requests, thus violating his due process rights.

Plaintiff filed his original complaint in July 1992, naming only Selsky as defendant. Plaintiff sued under 42 U.S.C. § 1983, claiming that defendant had violated his due process rights by affirming the results of each of his allegedly unfair hearings. Plaintiff's complaint sought "release from SHU and restoration of his privileges and rights, etc., and expungement of all misbehavior reports from his files, and declaratory relief by way of order to show cause for a T.R.O. and/or P.I.," as well as "$200 dollars in punitive damages and $200 dollars in compensatory damages and $200 exemplary damages for each day of confinement."

In September 1992, plaintiff filed a second complaint against the four hearing officers who had presided over his disciplinary hearings, and against the prison-appointed employee assistant who had helped plaintiff at one of his hearings. Plaintiff alleged that this last defendant had failed to provide him with adequate assistance and that the hearing officer defendants were responsible for violations of plaintiff's rights during the hearings.

The district court referred plaintiff's complaints to Magistrate Judge DiBianco. Thereafter, defendant Selsky moved to dismiss the complaint against him, arguing, among other things, that he was absolutely immune from suit. An accompanying affidavit of Assistant Attorney General Sue H.R. Adler pointed out that administrative appeals from disciplinary determinations in over 60 prisons in New York are directed to defendant's office, and that he works in the central office of the Department of Correctional Services, completely separate from any correctional facility. She asserted that his position is functionally comparable to that of an appellate judge. Plaintiff apparently filed an answering affidavit, pro se.

In his Report, the magistrate judge recommended that the first complaint be dismissed because Selsky was absolutely immune from suit and that the second complaint be dismissed because proper service had not been made on those defendants. The magistrate judge relied not only on the Adler affidavit but also on the magistrate's own Report–Recommendation in an earlier case involving Selsky, Dawes v. Selsky, No. 91–DV–0479 (N.D.N.Y.), and on the record there made. In that case, according to the magistrate judge, Selsky had furnished the court with an affidavit filed in still a third case, Codrington v. Selsky, No. 90–CV–868 (N.D.N.Y.), which stated that Selsky had administratively reviewed over 15,000 Tier III disciplinary determinations between 1988 and 1990 and that hundreds of civil suits had been brought against him by dissatisfied inmates. Also, apparently relying on the expanded record,

the magistrate judge found that "Selsky is insulated from political influence."

In June 1993, plaintiff Young filed objections to the magistrate's Report, contesting its finding that defendant Selsky was entitled to absolute immunity. In July 1993, Judge McCurn approved the Report and dismissed both complaints. Plaintiff appeals only from dismissal of his complaint against Selsky.

## II. Discussion

### A. Procedural background

This case comes before us in an unusual procedural posture. When plaintiff appealed from the adverse decision of the district court, he represented himself. Because of the importance and complexity of the issue presented in this case, on which district courts in this circuit are divided,[1] we appointed counsel and requested rebriefing. In the subsequent brief filed by his counsel, plaintiff complains that the magistrate's Report relied on documents that were not before the court, at least one of which plaintiff had never seen. These included the magistrate judge's earlier Report–Recommendation in *Dawes v. Selsky* and Selsky's affidavit in *Codrington v. Selsky.*

Further complicating the record before us on appeal, plaintiff has supplied us with an additional appendix, which contains portions of defendant Selsky's depositions and trial testimony in still other actions that challenged his alleged immunity to suit. Plaintiff also seeks to have us consider portions of defendant's sworn testimony that were quoted by the district court in *Moye v. Selsky,* 826 F.Supp. 712, 722–23 n. 11 (S.D.N.Y.1993). Apparently, none of this was before the district court when it ruled on the motion to

dismiss. However, the New York State Attorney General's office, which represents defendant in this case, presumably is familiar with these other proceedings because it represented defendant in all of them as well. These excerpts from defendant's prior testimony contain several important statements. Defendant said that he has telephone conversations approximately three times per week with hearing officers in which he gives advice on how to conduct the disciplinary hearings. Sometimes the hearing officers phone him to ask his advice during the course of a hearing. Also, defendant stated that "it is likely" that he would be called upon to review on appeal the very issues upon which he had offered advice. Moreover, he said that as part of his performance evaluations his supervisor conveys to him the objections of superintendents to his adverse rulings.

Although the use by plaintiff's counsel of prior testimony in other cases is somewhat unorthodox, the answering brief filed by the Attorney General for defendant raises no objection and does not contest the accuracy of the statements. To the contrary, defendant relies on some of this material to support his contention that he is subject to harassing litigation by inmates and is therefore entitled to absolute immunity. Since plaintiff asks us to take judicial notice of these transcripts and since defendant's brief in response does not object to this procedure, we believe that defendant has had an adequate opportunity to object to or otherwise comment on that proposed course of action. Cf. Fed.R.Evid. 201(b) & (e). While we could simply remand to the district court for a fuller development of the record, we believe that in view of the factual material already

1. Compare *Moye v. Selsky,* 826 F.Supp. 712, 724 (S.D.N.Y.1993) (holding Selsky not entitled to absolute immunity); *Lopez v. Coughlin,* 92 Civ. 7713 (KMW), 1994 WL 557988 (S.D.N.Y. Oct. 11, 1994); *Silva v. Sanford,* 91–CV–1776, 1994 WL 455170, at *20 (S.D.N.Y. Aug. 18, 1994) (same); *Gilbert v. Selsky,* 867 F.Supp. 159, at 162–64 (S.D.N.Y., Sept. 9, 1994) (same) with *Sealey v. Coughlin,* 857 F.Supp. 214, 218 (N.D.N.Y.1994) (holding Selsky entitled to absolute immunity); *Cortez v. Selsky,* 91 Civ.1905 (RWS), 1994 WL 484383, at *2–6 (S.D.N.Y. Sept. 7, 1994) (same); *Gaston v. Coughlin,* 861

F.Supp. 199, at 211 (W.D.N.Y.1994) (same); *Hameed v. Mann,* 89–CV–578 (N.D.N.Y. Nov. 9, 1993) (same); *Parris v. Coughlin,* 90 CV 414, 1993 WL 328199, at *4 (N.D.N.Y. Aug. 23, 1993) (same); *Parkinson v. Employee Assistant,* DCF, 91 Civ. 7401 (KMW), 1993 WL 118451 (S.D.N.Y. Apr. 7, 1993) (same); *Pacheco v. Kihl,* Civ.–90–549T, 1991 WL 629846, at *3–4 (W.D.N.Y. Dec. 17, 1991) (same); *Gayle v. Selsky,* Civ. 90–729L (W.D.N.Y. Feb. 19, 1992). A Nebraska district court has also held prison disciplinary appeal officers to be entitled to absolute immunity. *Shaddy v. Gunter,* 690 F.Supp. 860, 864–65 (D.Neb.1988).

brought to our attention by both sides and relied upon by them, it is preferable to resolve the basic issue before us regarding absolute immunity. Under the unusual circumstances of this case, therefore, we take judicial notice of this testimony and we accept it as part of the record on appeal. Cf. *Shuttlesworth v. Birmingham,* 394 U.S. 147, 157, 89 S.Ct. 935, 942, 22 L.Ed.2d 162 (1969); *Jacques v. United States R.R. Retirement Bd.,* 736 F.2d 34, 40 (2d Cir.1984); *First Federal Sav. Bank v. Tazzia,* 696 F.Supp. 904, 909 (S.D.N.Y.1988); 9 Wright & Miller, Federal Practice and Procedure § 2410, at 359–61 (1971 & 1994 pocket part).

B. Absolute immunity

1. Standards for absolute immunity

■ "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns v. Reed,* 500 U.S. 478, 486–87, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547 (1991). State actors who seek absolute immunity "bear the burden of showing that public policy requires an exemption of that scope." *Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978).

■ Judges enjoy absolute immunity from personal liability for "acts committed within their judicial jurisdiction." *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). The tradition of judicial immunity dates back to English common law. *Butz,* 438 U.S. at 508, 98 S.Ct. at 2911. Without insulation from liability, judges would be subject to harassment and intimidation and would thus "lose 'that independence without which no judiciary can either be respectable or useful.'" Id. at 509, 98 S.Ct. at 2912 (quoting *Bradley v. Fisher,* 13 Wall. 335, 347, 20 L.Ed. 646 (1872)). The absolute immunity of a judge applies "'however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff.'" *Cleavinger v. Saxner,* 474 U.S. 193, 199–200, 106 S.Ct. 496, 499, 88 L.Ed.2d 507 (1985) (quoting *Bradley,* 13 Wall. at 347).

■ "Judges have absolute immunity not because of their particular location within the Government but because of the special nature of their responsibilities." *Butz,* 438 U.S. at 511, 98 S.Ct. at 2913. Thus, absolute immunity has been extended to individuals performing duties "closely associated with the judicial process." *Cleavinger,* 474 U.S. at 200, 106 S.Ct. at 500. For example, a federal probation officer preparing presentence reports "acts as an arm of the court" and thus has absolute immunity to personal liability for damages. *Dorman v. Higgins,* 821 F.2d 133, 137–38 (2d Cir.1987).

■ Whether non-judicial officers merit quasi-judicial absolute immunity depends upon "the functional comparability of their judgments to those of the judge." *Imbler v. Pachtman,* 424 U.S. 409, 423 n. 20, 96 S.Ct. 984, 991 n. 20, 47 L.Ed.2d 128 (1976). The functional comparability analysis is made by considering the following six factors, among others, characteristic of the judicial process:

(a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of the error on appeal.

*Cleavinger,* 474 U.S. at 202, 106 S.Ct. at 500 (citing *Butz,* 438 U.S. at 512, 98 S.Ct. at 2913).

Applying this analysis, the Supreme Court held in *Butz* that administrative law judges or hearing examiners within the executive branch who act pursuant to the Administrative Procedure Act (APA), are entitled to absolute immunity. As the Court noted, "[t]he conflicts which federal hearing examiners seek to resolve are every bit as fractious as those which come to court." *Butz,* 438 U.S. at 513, 98 S.Ct. at 2914. The Court went on to justify absolute immunity on the ground that administrative adjudications contain many of the same procedural safeguards that characterize judicial proceedings. For example,

[administrative] proceedings are adversary in nature. They are conducted before a

trier of fact insulated from political influence. A party is entitled to present his case by oral or documentary evidence, and the transcript of testimony and exhibits together with the pleadings constitute the exclusive record for decision. The parties are entitled to know the findings and conclusions on all of the issues of fact, law, or discretion presented on the record.

Id. (citations omitted). Furthermore, the Court stated that the position of administrative hearing examiners is structured to provide for a high degree of independence from the agency.

When conducting a hearing ..., a hearing examiner is not responsible to, or subject to the supervision or direction of, employees or agents engaged in the performance of investigative or prosecution functions for the agency. Nor may a hearing examiner consult any person or party, including other agency officials, concerning a fact at issue in the hearing, unless on notice and opportunity for all parties to participate. Hearing examiners must be assigned to cases in rotation so far as is practicable.

*Butz*, 438 U.S. at 514, 98 S.Ct. at 2914 (citations omitted).

■ In contrast, the Court has found prison officials, such as members of a prison disciplinary committee, "who hear cases in which inmates are charged with rules infractions," not entitled to absolute immunity. *Cleavinger*, 474 U.S. at 194, 206, 106 S.Ct. 496, 503. The Court found the committee members lacked independence:

They are not professional hearing officers, as are administrative law judges.... They are employees of the Bureau of Prisons and they are the direct subordinates of the warden who reviews their decision. They work with the fellow employee who lodges the charge against the inmate upon whom they sit in judgment. The credibility determination they make often is one between a co-worker and an inmate. They thus are under obvious pressure to resolve a disciplinary dispute in favor of the institution and their fellow employee.

Id. at 203–04, 106 S.Ct. at 501–02.

Furthermore, the *Cleavinger* Court found that a prison disciplinary proceeding contained few of the procedural safeguards relied upon in *Butz* "to insure the avoidance or correction of constitutional errors." For example,

[t]he prisoner was to be afforded neither a lawyer nor an independent nonstaff representative. There was no right to compel the attendance of witnesses or to cross-examine. There was no right to discovery. There was no cognizable burden of proof. No verbatim transcript was afforded. Information presented often was hearsay or self-serving. The committee members were not truly independent.

Id. at 206, 106 S.Ct. at 503. Because the Agriculture Department hearing examiners in *Butz* displayed many more of the characteristics associated with the judiciary than did the prison disciplinary officers in *Cleavinger*, the Court found that even though the former were entitled to quasi-judicial absolute immunity the latter were entitled to qualified immunity only.

### 2. Application to the present case

■ Turning to the present case, we examine defendant's position in light of the six judicial characteristics the Supreme Court described in *Butz* and *Cleavinger*.

First, it is clear that defendant needs to perform his duties free from harassment and intimidation. Although defendant has been subject to numerous suits and discovery requests, he has testified that these actions do not influence his decisionmaking process in any way. Trial testimony of Donald Selsky, conducted on Nov. 2, 1993, in connection with Hameed v. Mann, 89–CV–578 (Selsky testimony in *Hameed*). These suits do not drain his personal financial resources because the state Attorney General provides him with legal representation. N.Y. Public Officers Law § 17(2)(a) (McKinney). Were defendant ever found liable in a § 1983 action, he would be entitled to indemnification by the state unless the damages "resulted from [defendant's] intentional wrongdoing." Id. at § 17(3)(a). As noted below, even in the absence of absolute immunity, defendant would be protected, in appropriate cases, by the doctrine of qualified immunity and by "firm

application of the Federal Rules of Civil Procedure" including the procedural devices of summary judgment and a motion to dismiss. *Butz,* 438 U.S. at 307–08, 98 S.Ct. at 2757.

We recognize that the plaintiff in this case has abused the district court's resources in the past by engaging in a pattern of vexatious litigation. Such inmates, if unchecked, could seriously undermine defendant's ability to function as an independent reviewer. Because of plaintiff's past pattern of bringing frivolous actions, however, Chief Judge Griesa of the Southern District has subjected him to strong sanctions, including limiting him to four unrepresented filings per year. *In re Young,* 93 Civ. 4320 (S.D.N.Y. June 24, 1993). Furthermore, in the appeal before us plaintiff is represented by counsel, who was appointed at this panel's suggestion. Nevertheless, we recognize that the possibility of harassment by litigation is a potentially serious problem in administering the prison disciplinary system.

Second, the disciplinary hearings at issue in this case suffer from the same procedural shortcomings as those in *Cleavinger,* except for the fact that the inmate has access to a verbatim transcript. *Moye,* 826 F.Supp. at 721. The lack of procedural safeguards at the hearing carries over to the administrative appeal before defendant, since that appeal relies on the same evidence adduced at the hearing and affords no additional procedural safeguards. *Id.* Furthermore, unlike the administrative hearing examiners in *Butz,* who were prohibited under the APA from performing "duties inconsistent with their duties as hearing officers ... [such as] consult[ing] any person or party, *including other agency officials,* concerning a fact at issue in the hearing," 438 U.S. at 514, 98 S.Ct. at 2914 (emphasis supplied), defendant gives prison staff members advice on the conduct of hearings. He offers assistance in response to both general and "specific inquiries that arise during the course of a hearing." *Moye,* 826 F.Supp. at 722. See also Selsky testimony in *Hameed;* Deposition testimony of Donald Selsky, conducted on Oct. 15, 1993, in connection with *Figueroa v. Selsky,* 91 Civ. 3261 (JES) (Selsky deposition in *Figueroa* ). Defendant's brief on appeal concedes that he

gives such advice approximately three times per week. Thus, in certain cases, Selsky may be the only reviewer of rulings that are in essence his own. *Moye,* 826 F.Supp. at 723.

Third, defendant is not sufficiently independent to justify absolute immunity. "The simple fact that Selsky serves at the pleasure of superiors within DOCS creates a dependence upon the goodwill of these officials, who may, on occasion, place institutional interests above the rights of inmates." Id. For example, defendant has testified that he is supervised by Glenn Goord, the same person who supervises prison superintendents. Defendant stated that superintendents are likely to complain to Goord when defendant makes a determination that they consider adverse, and that Goord conveys this information to defendant in evaluating his work. Selsky deposition in *Figueroa.* Moreover, it is very likely that defendant will be called upon to rule on policies instituted by his superiors at DOCS. Thus, his function in the prison system exhibits the "relationship between the keeper and the kept" warned of in *Cleavinger. Moye,* 826 F.Supp. at 722 (citing *Cleavinger,* 474 U.S. at 204, 106 S.Ct. at 502). We agree with Judge Ward in *Moye* that defendant is not "truly independent." Id. at 723. Defendant relies on a Sixth Circuit case, *Shelly v. Johnson,* 849 F.2d 228 (6th Cir.1988) to show that he is sufficiently independent to justify absolute immunity. That case, however, which involved Michigan state prison hearing officers, is factually distinguishable. We note, moreover, that this circuit has already held that New York State correction officers who function as hearing officers are entitled to qualified immunity only. *Walker v. Bates,* 23 F.3d 652, 656 (2d Cir.1994); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993).

Fourth, defendant relies on administrative and case law precedent in arriving at his decisions. *Moye,* 826 F.Supp. at 723. In this respect, his function resembles that of a judge.

Fifth, neither the disciplinary hearing nor the administrative appeal is truly adversarial in nature. Prisoners have no right to counsel in either proceeding. Furthermore, their rights to cross-examine and challenge witnesses and evidence are limited. *Id.* The disciplinary hearings "rely heavily on hearsay, including unverifiable information from

prison guards and informants." *Id.* at 721. As noted above, the procedural laxity of the disciplinary hearing is not cured on administrative appeal. *Id.*

By contrast, the hearings at issue in *Butz* were far more adversarial in nature. As the *Butz* Court pointed out, 438 U.S. at 513, 98 S.Ct. at 2914, the APA provides that parties in administrative hearings are entitled to be represented by counsel. 5 U.S.C. § 555(b). The agency may issue subpoenas upon a party's request. Id. at § 555(d). Parties are entitled to present their cases by oral or documentary evidence, which includes the right to conduct cross-examination. Id. at § 556(d).

Sixth, the type of injury plaintiff alleged may not be adequately correctable on appeal. We have recently held that purely prospective relief on administrative appeal does not adequately cure a due process violation in a disciplinary hearing if the prisoner has already served part of his disciplinary sentence in the SHU pending administrative review. *Walker*, 23 F.3d at 658. Similarly, if the administrative appeal officer compounds the violation by unreasonably affirming, a later reversal in state court will be inadequate unless it includes monetary damages. Aside from the prison superintendent, who has discretionary authority to reduce a penalty, it appears that defendant Selsky provides the highest level of administrative review of disciplinary proceedings. 7 NYCRR § 254.8–9. Although defendant argues that a prisoner can obtain expeditious review of defendant's decisions under N.Y. Civil Practice Law and Rules Article 78, monetary damages are not available in such a proceeding. See *Nelson v. Coughlin*, 115 A.D.2d 131, 495 N.Y.S.2d 528 (3d Dep't 1985); *Gittens v. State*, 132 Misc.2d 399, 504 N.Y.S.2d 969 (Ct.Cl.1986). While damages are technically available in a narrow set of circumstances through an action in the Court of Claims, the scope of state immunity in these cases is uncertain. *Arteaga v. State*, 72 N.Y.2d 212, 532 N.Y.S.2d 57, 527 N.E.2d 1194 (N.Y.1988); *Minieri v. State*, 204 A.D.2d 982, 613 N.Y.S.2d 510 (4th Dep't 1994).

In sum, taking into account the presumption against absolute immunity, *Burns*, 500 U.S. at 486–87, 111 S.Ct. at 1939, and a defendant's corresponding burden in seeking to justify it, *Butz*, 438 U.S. at 506, 98 S.Ct. at

2910, we believe that the scale tips against defendant's claim of absolute immunity. We have no hesitancy in stating that this is far from an easy case and that the factors that influence us most are the lack of a sufficient guarantee of defendant's independence and insulation from communication with hearing officers about specific cases. Should this change in the future by restructuring defendant's position or by other means, the result might well be different. Cf. *Cleavinger*, 474 U.S. at 208, 106 S.Ct. at 504 ("Congress could even consider putting in place administrative law judges to preside at prison committee hearings.").

### C. Qualified immunity

Even though defendant is not entitled to absolute immunity with respect to plaintiff's claims for damages, he may be entitled to at least qualified immunity, as plaintiff concedes. *Richardson*, 5 F.3d at 623–24 (held Selsky entitled to qualified immunity on facts before court; no discussion of absolute immunity). A government official has qualified immunity from liability for damages based on his official acts as long as those acts violate no clearly established statutory or constitutional right. *Weg v. Macchiarola*, 995 F.2d 15, 18 (2d Cir.1993). The defendant must establish that he had an objectively reasonable belief that his act violated no clearly established rights. Id. Since the district court did not consider this issue, we remand so that it may do so.

Judgment reversed and case remanded for further proceedings consistent with this opinion.

VAN GRAAFEILAND, Circuit Judge, dissenting:

When Congress enacted the Ku Klux Klan Act, of which 42 U.S.C. § 1983 is a part, its principal goal was to eliminate the corrupting influence of the Klan and its sympathizers in the governments and law enforcement agencies of the Southern States. See *Allen v. McCurry*, 449 U.S. 90, 98, 101 S.Ct. 411, 417, 66 L.Ed.2d 308 (1980). Section 1983 created no substantive rights; "it merely provide[d] remedies for deprivations of rights established elsewhere." *Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 2432, 85 L.Ed.2d 791 (1985); *Sykes v. James*, 13 F.3d 515, 519 (2d Cir.1993), *cert. denied*, ⸺ U.S.

——, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994). Congress could not have intended that pro se civil rights litigation become a "recreational activity" for long-term residents of our prisons. *See James v. Quinlan*, 886 F.2d 37, 40 n. 5 (3d Cir.1989) (quoting *Gabel v. Lynaugh*, 835 F.2d 124, 125 n. 1 (5th Cir.1988)). However, this is what has occurred. Thus, in *Gabel*, the court stated that about one appeal in every six during the preceding four months was a state prisoner's pro se civil rights case. 835 F.2d at 125 n. 1. The following far from comprehensive tabulation of similar excessive filings in other cases is illustrative:

| Case | Actions by same Prisoner |
| --- | --- |
| *Franklin v. Murphy* 745 F.2d 1221, 1231 n. 13 (9th Cir.1984) | over 100 |
| *In re Green* 669 F.2d 779, 781 (D.C.Cir.1981) | 600–700 in 10 years |
| *Gelabert v. Lynaugh* 894 F.2d 746, 748 (5th Cir.1990) | 15 appeals in 3 years |
| *Reneer v. Sewell* 975 F.2d 258, 261 (6th Cir.1992) | 17 actions, 9 appeals |
| *Visser v. Supreme Court of California* 919 F.2d 113, 114 (9th Cir.1990) | 11 in 16 months |
| *Demos v. Kincheloe* 563 F.Supp. 30, 31 (E.D.Wash.1982) | 184 in 3 years |
| *Olson v. Coleman* 997 F.2d 726, 728 (10th Cir.1993) | 37 appeals, 15 petitions for rehearing |
| *Abdul–Akbar v. Watson* 901 F.2d 329, 331 (3d Cir.1990) | 43 in 7 years |
| *Johnson v. Cowley* 872 F.2d 342, 344 (10th Cir.1989) | 54 actions, 33 appeals |
| *Procup v. Strickland* 792 F.2d 1069, 1070 (11th Cir.1986) | over 176 |
| *In re Tyler* 839 F.2d 1290, 1291 (8th Cir.1988) | 149 |

With the tremendous upsurge in section 1983 civil rights litigation came the realization that the concept of official immunity was not designed solely to protect against the personal liability of the official involved. The resources of United States Courts are limited both in time and in money. The courts are obligated, therefore, to allocate their resources in a way that promotes the interests of justice. The Supreme Court has emphasized this judicial responsibility on several occasions. In *In re McDonald*, 489 U.S. 180, 109 S.Ct. 993, 103 L.Ed.2d 158 (1989), a per curiam Court denied a pro se petitioner's request for permission to proceed *in forma pauperis* in applying for a writ of habeas corpus. Citing the petitioner's 73 unsuccessful prior filings with the Court, it said:

> Every paper filed with the Clerk of this Court, no matter how repetitious or frivolous, requires some portion of the institution's limited resources. A part of the Court's responsibility is to see that these resources are allocated in a way that promotes the interests of justice.

*Id.* at 184, 109 S.Ct. at 996.

In *In re Sindram*, 498 U.S. 177, 179–80, 111 S.Ct. 596, 597, 112 L.Ed.2d 599 (1991), the Court, citing *McDonald, supra*, said:

> As we explained, the Court waives filing fees and costs for indigent individuals in order to promote the interests of justice. The goal of fairly dispensing justice, however, is compromised when the Court is forced to devote its limited resources to the processing of repetitious and frivolous requests. *Pro se* petitioners have a greater capacity than most to disrupt the fair allocation of judicial resources because they are not subject to the financial considerations—filing fees and attorney's fees—that deter other litigants from filing frivolous petitions.

In *Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), which involved a section 1983 action against a police officer who allegedly gave perjured testimony, Justice Stevens, writing for six members of the Court, said:

As the files in this case show, even the processing of a complaint that is dismissed before trial consumes a considerable amount of time and resources.

This category of § 1983 litigation might well impose significant burdens on the judicial system and on law enforcement resources. As this Court noted when it recognized absolute immunity for prosecutors in *Imbler*, if the defendant official "could be made to answer in court each time [a disgruntled defendant] charged him with wrongdoing, his energy and attention would be diverted from the pressing duty of enforcing the criminal law." 424 U.S., at 425 [96 S.Ct. at 992]. To some degree the individual's burden might be alleviated by the government's provision of counsel, but a case that goes to trial always imposes significant emotional and other costs on every party litigant.

*Id.* at 343, 103 S.Ct. at 1119 (footnote omitted).

In Justice Rehnquist's dissenting opinion in *Cleavinger v. Saxner*, 474 U.S. 193, 210–11, 106 S.Ct. 496, 505–06, 88 L.Ed.2d 507 (1985), he addressed squarely the issue of prisoners' propensity to sue:

Not only may emotions run higher and tensions be exacerbated in the prison environment, but prisoners simply are not subject to many of the constraints which often deter members of the population at large from litigating at the drop of a hat. We have held, for example, that prisoners in confinement are entitled to free access to lawbooks or some other legal assistance. *Bounds v. Smith*, 430 U.S. 817 [97 S.Ct. 1491, 52 L.Ed.2d 72] (1977). And the great majority of prisoners qualify for *in forma pauperis* status, which entitles them to relief from statutory filing fees. With less to profitably occupy their time than potential litigants on the outside, and with a justified feeling that they have much to gain and virtually nothing to lose, prisoners appear to be far more prolific litigants than other groups in the population. And prisoners have made increasing use of § 1983 and *Bivens*-type suits in recent years: 18,856 such suits were filed in fed-

eral court in the year ending June 30, 1984, as compared to just 6,606 in 1975. *See also Gray v. Bell*, 712 F.2d 490, 496–97 (D.C.Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984), *and Robichaud v. Ronan*, 351 F.2d 533, 535–36 (9th Cir.1965), where the courts listed among the reasons for awarding immunity, (1) the drain on the valuable official time of defending numerous suits, (2) the unfairness of exposing officials to vicarious liability for the acts of their subordinates, and (3) the duty of fairly representing the interests of the public in protecting and preserving the sound and orderly administration of justice. Some of these issues also were discussed by the Supreme Court in *Imbler v. Pachtman*, 424 U.S. 409, 422–29, 96 S.Ct. 984, 991–94, 47 L.Ed.2d 128 (1976).

I believe that the above reasoning mandates the dismissal of the complaint in the instant case on the ground of absolute immunity. Selsky is a professional civilian hearing officer who performs a role analogous to that of an appellate judge in that he hears prisoners' appeals from 66 New York State prisons, with none of which he has any official connection. He hears well over 5,000 appeals a year and, at the time the instant action was brought, he was a defendant in 156 pending actions. He establishes no direct contact with prisoners or guards by participating in prisoners' hearings as a subordinate of the warden.

Selsky's department does, however, conduct training sessions for hearing officers in the various prisons, in which the requirements of due process are taught and emphasized. Selsky also is available to answer procedural questions asked of him by hearing examiners as they arise. When questioned about this practice, he testified "I don't get into the specifics of the case or the inmate we are dealing with, but just maybe the issue." Obviously, Selsky's intent is to avoid due process violations whenever possible. This is his intent during the training sessions of hearing officers; this is his intent when responding to their inquiries; this continues to be his intent when reviewing appeals. His conduct does not constitute consulting "concerning a fact at issue in the hearing," a

practice that is proscribed in *Butz v. Economou*, 438 U.S. 478, 514, 98 S.Ct. 2894, 2914, 57 L.Ed.2d 895 (1978).

My colleagues conclude from the foregoing that Selsky may be reviewing rulings that are in essence his own. *Supra*, at 53. There is no evidence, however, that this occurred in the instant case. If I am asked to assume that it did, I will assume also that Selsky made the same good-faith interpretation of due process requirements in each instance. Every appellate tribunal prescribes rules for the conduct of its subordinate bodies. They are not thus precluded from passing upon the merits of what they have prescribed.

Like Justice Scalia in *Anderson v. Creighton*, 483 U.S. 635, 641–42 n. 3, 107 S.Ct. 3034, 3040 n. 3, 97 L.Ed.2d 523 (1987), I find unpersuasive the argument often made that Selsky may be less diligent in enforcing constitutional principles because the State indemnifies him for unintentional error. Federal judges do not stray from the full-faith performance of their duties because they have lifetime appointments and absolute immunity. Selsky's employment would be short-lived if he was comfortable in error because of his entitlement to indemnification.

Young is a paradigmatic litigious prisoner, having brought over 100, mostly frivolous, pro se proceedings, at least 60 of which required action by this Court. It is difficult to control excesses such as this by indigent prisoners who have no money and already are incarcerated. Injunctions and penalties are of little help in preventing such improper conduct. The "strong sanctions" referred to by my colleagues, *supra*, at 53, simply will not work if no effective punishment can be imposed upon recalcitrant prisoners.

Qualified immunity, although better than no immunity at all, is not a satisfactory solution to the problem. Qualified immunity is an affirmative defense that must be pleaded and proved by the defendant. Each paper filed with the court and each argument heard in support of this defense utilizes some portion of the court's limited resources. In every one of the 156 actions now pending against Selsky, and in every one of the nu-merous pro se actions that undoubtedly will follow my colleagues' holding, Selsky will have the burden of proving that it was objectively reasonable to conclude that the prisoner's constitutional rights were not violated. His decisions under review will have been based in large part upon factual issues that do not lend themselves to summary adjudication. *See Mahoney v. Hankin*, 844 F.2d 64, 68–69 (2d Cir.1988). The immediate responsibility for the alleged violations will be that of the examiner who conducted the hearing and who concededly can claim only qualified immunity. Appellants such as Young, who seek only monetary relief, will have little to gain by suing Selsky, except whatever satisfaction they can derive from their acts of harassment. This is not the purpose for which section 1983 was enacted.